JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FOROUD FOLADPOUR, an individual,

Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, a
Connecticut corporation, and DOES 1-
10, inclusive,

Defendant.

CASE No. SACV 13-01722-JLS (JPRx)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW UPON
ADMINISTRATIVE REVIEW

I.      INTRODUCTION

This action is brought pursuant to the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, by Plaintiff Foroud Foladpour

against defendant Hartford Life and Accident Insurance Company ("Hartford").

Plaintiff alleges that Hartford abused its discretion in terminating her long-term

disability ("LTD") benefits.  Hartford is the insurer and claims administrator for the

1

Group Long Term Disability Benefits Plan (the "Plan").  ITT Educational Services, Inc. ("ITT"), Plaintiff's former employer, is the Plan's sponsor. The Plan is an employee welfare benefit plan governed by ERISA.

The parties have submitted the Administrative Record ("AR") and proposed findings of fact and conclusions of law for review. The parties agreed to submit the case to the Court for findings of fact and conclusions of law based on the pleadings, papers, and Administrative Record. For the following reasons and pursuant to the standard of review set forth below, Hartford's decision terminating Plaintiff's LTD benefits is AFFIRMED.

## II.   FINDINGS OF FACT

The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.[1]

### A. Plan Provisions

1.   Hartford issued Group Insurance Policy number GLT675331 to ITT so that ITT could provide LTD benefits to its qualified employees. (AR 596-97.)[2]

---

[1]  To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact. To the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

[2]  All citations are to the Administrative Record ("AR"), filed by Defendant on October 3, 2014. (Doc. 46.)

2.     The Plan provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the Plan. (AR 624.)

3.     The Plan has an Elimination Period consisting of the first 182 consecutive day period of any one period of disability. (AR 597.)

4.     The Plan defines disability as follows:  (A) during the Elimination Period, the employee is prevented from performing one or more of the essential duties of her occupation; (B) for the twenty-four months following the Elimination Period, the employee is prevented from performing one or more of the essential duties of her occupation and, as a result, the employee's current monthly earnings are less than 80% of the employee's Indexed Pre-Disability Earnings; and (C) after that twenty-four month period, the employee is prevented from performing one or more of the essential duties of *any* occupation. (AR 613.)

5.     Under "Option 1," an employee who is disabled under the Plan is entitled to 50% of pre-disability monthly earnings. (AR 597.)

6.     The Plan defines "full-time employment" as "30 hours weekly." (AR 891.)

7.     Under the terms of the Plan, Plaintiff bears the burden of establishing a "proof of loss" to establish initial and continued eligibility for benefits. (AR 894-95.)

8.     To determine whether Plaintiff has established proof of loss, the terms of the Plan provide that Plaintiff may be required to undergo an independent medical examination. (AR 904.)

   **B. Foladpour's Injury**

9.     Plaintiff was hired by ITT on April 4, 2008, as an Admissions Representative. (AR 851.)

10.     On September 17, 2008, Plaintiff injured her left (non-dominant) hand while attempting to open the lunch room door at work. (AR 849.)

11.     Plaintiff's hand was on the door handle when a "co-worker opened the door hard twisting ["Plaintiff's left] hand." (*Id.*)

12.     The accident caused immediate swelling and discoloration and Plaintiff experienced a sharp pain in her left wrist and hand later that day. (AR 670.)

13.     Plaintiff was taken to Western Medical Group the next day, September 18, 2008. (AR 797.)

14.     X-rays were taken there of Plaintiff's cervical spine, left shoulder, left wrist and left hand. The x-rays did not reveal any fractures. (AR 834, 849.)

15.     Plaintiff was treated at the Western Medical Group from September 18, 2008 through April 15, 2009. (AR 778-97.)

16.     During this time, for the most part, Plaintiff saw Dr. Giacobetti at the Western Medical Group. (*Id.*)

17.     On September 20, 2008, Plaintiff was seen by Dr. Paz Eilat of the Western Medical Group. (AR 849.)

18.     Dr. Eilat diagnosed Plaintiff with trapezius strain, left shoulder sprain, left wrist sprain, and left hand sprain. (*Id.*)

19.     On October 29, 20008, Plaintiff underwent a CT scan which showed an area of lucency within the ulnar styloid process. (AR 844.)

20.     On December 30, 2008, Plaintiff went to the Western Hand Center and saw hand surgeon Dr. Andre Chaves. (AR 834-38.)

21.     Dr. Chaves diagnosed Plaintiff with DeQuervain's tenosynovitis, which is an irritation of the tendons around the base of the thumb. (AR 836.)

22.     In his Initial Consultation Report, Dr. Chaves noted:  "This patient presents to my office with an injury that appears to have been relatively mild." (*Id.*)

23.     Dr. Chaves remarked that the lucency in the ulnar styloid process was an "unrelated finding" that had nothing to do with Plaintiff's injury. (*Id.*)

24.     Dr. Chaves also found that "the patient's effort in obtaining grip strength was minimal" and he did not "believe that her range of motion loss at the finger level [was] legitimate." (*Id.*)

25.     Dr. Chaves concluded as follows:

> In my opinion, the patient is indeed on temporary partial
> disability regardless of her refusal to return to work. If one

had the duties available, the patient may return to work with the protection of a thumb spica splint which she does have. She is not permanent or stationary as she has not truly received any specific treatment to the right upper extremity. However, with or without surgery . . . it is not likely the patient will have any specific permanent impairment to the wrist region only.

(AR 837.)

26.    An MRI taken in in January 2009 showed some minimal changes at the humeral neck but no evidence of a cuff tear. (AR 723.)

27.    An EMG study done in April 2009 was suggestive of mild left carpal tunnel syndrome. (AR 847.)

28.    Plaintiff was re-evaluated by Dr. Chaves on July 7, 2009. (AR 808-809.)

29.    In a Progress Report, Dr. Chaves noted:  "All this is rather bizarre, in a patient who also has symptoms that far exceed what one would expect from the nature of her pathology." (AR 809.)

30.    Dr. Chaves concluded that he could not return Plaintiff "to a full duty capacity with the current level of symptomology." (*Id.*)

### C. The Workers' Compensation Claim

31.    Plaintiff filed a Workers' Compensation claim on or shortly after the

accident and began receiving Workers' Compensation benefits effective September 17, 2008. (AR 111.)

32.    During the course of her Workers' Compensation claim, Plaintiff was treated by a number of doctors, including Dr. Eilant, Dr. Giacobetti, Dr. Chaves, Dr. Vincent Gumbs, Dr. Randy Rosen, Dr. Donald Kim, Dr. Bijan Zardouz, Dr. Gary Baker and Dr. Afshin Mashoof. (*See, e.g.,* AR 96-99, 109-13, 177-78, 255.)

33.    On March 17, 2010, Kim Torres, a chiropractor, prepared a Functional Capacity Evaluation ("FCE") in connection with Plaintiff's Workers' Compensation case. (AR 761-74.)

34.    In the FCE, Torres found that although Plaintiff had semi-sedentary functional capacity, she was not able to return to work or perform her usual occupation. (AR 773.)

35.    Dr. Kim completed a Qualified Medical Evaluation ("QME") on May 17, 2010. (AR 669-80.)

36.    Dr. Kim found that Plaintiff was experiencing severe pain as a result of a complex regional pain syndrome. (AR 676.)

37.    Dr. Kim concluded that Plaintiff was "temporarily totally disabled until she can continue with pain management." (*Id.*)

38.    Plaintiff's Workers' Compensation benefits ended on October 6, 2010. (AR 160.)

39.     On July 20, 2011, Plaintiff entered into a final settlement for future medical treatment and permanent disability benefits in her Workers' Compensation case. (AR 32, 447.)

**D. Payment of Benefits**

40.     On March 26, 2010, Plaintiff submitted a claim for LTD benefits to Hartford. (AR 854-58.)

41.     As part of her application, Plaintiff submitted an Attending Physician's Statement of Functionality ("APSF") completed by Dr. Gumbs. (AR 582-83.)

42.     In the APSF, Dr. Gumbs listed Plaintiff's primary diagnoses as: left shoulder tendinitis, cervical spine sprain and strain, chronic left wrist tendinitis, left wrist sprain and strain, and left elbow epicondylitis. (AR 582.)

43.     Dr. Gumbs' secondary diagnoses included left trapezial muscle sprain and strain and left medial epicondylitis. (*Id.*)

44.     Dr. Gumbs indicated that Plaintiff was incapable of carrying any weight in her left hand and she could only sit, stand and walk up to two hours a day. (AR 583.)

45.     Dr. Gumbs indicated that he expected these restrictions would last through May 3, 2010. (*Id.*)

46.     Hartford acknowledged receipt of Plaintiff's claim on April 2, 2010. (AR 637.)

47.     In connection with Plaintiff's LTD claim, Hartford obtained medical records from Plaintiff's Workers' Compensation doctors. *(Id.)*

48.     On June 9, 2010, Hartford approved Plaintiff's claim for LTD benefits, retroactively effective as of March 19, 2009. (AR 169-73.)

49.     On November 2, 2010, Dr. Mashoof submitted an Attending Physician's Statement of Continued Disability ("APSCD") to Hartford. (AR 489-90.)

50.     Dr. Mashoof's diagnoses included left shoulder tendonitis, reflex sympathetic dystrophy ("RSD"), radiculopathy, and cervical sprain and strain. (AR 489.)

51.     Dr. Mashoof indicated that Plaintiff could not sit, stand, or walk for any amount of time. (AR 490.)

52.     Dr. Mashoof concluded that Plaintiff was "TTD" (temporarily totally disabled). *(Id.)*

53.     On October 19, 2010, Plaintiff informed Hartford that she had breast cancer and was undergoing post-surgical chemotherapy. (AR 83, 86.)

54.      Hartford received a letter dated October 1, 2010, from oncologist Dr. Haresh Jhangiani confirming Plaintiff's breast cancer. (AR 565.)

55.     On March 19, 2011, the definition of disability under the Plan changed to an "any occupation" standard for Plaintiff. (AR 863.)

56.     After reviewing the medical information, Hartford determined that

Plaintiff was disabled under an "any occupation" standard. (AR 68.)

57.     Hartford notified Plaintiff on February 18, 2011, that she would keep receiving LTD benefits under the stricter "any occupation" standard. (AR 152.)

58.     Hartford also informed Plaintiff that she would be required to periodically furnish continued proof of disability. (*Id.*)

59.     On August 1, 2011, Dr. Mashoof submitted another APSCD to Hartford. (AR 215-16.)

60.     Dr. Mashoof diagnosed Plaintiff with left shoulder tendonitis and cervical sprain/strain. (AR 215.)

61.     Dr. Mashoof found Plaintiff to be able to sit four hours a day, and stand and walk for thirty minutes a day. (AR 216.)

62.     Dr. Mashoof indicated that Plaintiff could work a five-hour (part-time) work day. (*Id.*)

63.     Hartford continued to pay Plaintiff LTD benefits throughout 2012.

**E. Hartford's Subsequent Review**

64.     In March 2012, Dr. Jhangiani informed Hartford that there were no longer any signs of Plaintiff's breast cancer. (AR 467-68.)

65.     A note dated March 27, 2012, from the Compassionate Cancer Care Medical Group, Inc., indicated that Plaintiff was able to work part-time, three days a week. (AR 480.)

66.     In March 2012, Plaintiff began seeing Dr. Afdal Allam, a family practice physician. (AR 478.)

67.     Dr. Allam submitted an APSCD to Hartford on March 23, 2012. (AR 478-79.)

68.     Plaintiff's diagnoses in the APSCD were left shoulder tendonitis and cervical sprain/strain. (*Id.*)

69.     Restrictions included lifting no more than five pounds, reaching no more than twenty degrees above horizontal level, and sitting for five hours, standing two hours, and walking one hour. (*Id.*)

70.     Dr. Allam noted that Plaintiff was able to work part-time. (*Id.*)

71.     In May 2012, Hartford began to question whether Plaintiff was still "disabled" within the meaning of the Plan after her request for Social Security benefits was denied, in light of the observation that her continuing complaints of pain seemed extreme and exceeded the normal duration for her injuries, and because she had not undergone any surgery despite the severity of her complaints. (AR 861-63.)

72.     During a January 3, 2013 office visit, Dr. Allam noted that Plaintiff had normal musculature, no joint deformities or abnormalities, and a normal range of motion in all four extremities for her age. (AR 356-58.)

73.     Dr. Allam sent Hartford another APSCD, this one dated February 20, 2013, which included the following restrictions:  lifting no more than five

pounds, and reaching no more than twenty degrees above horizontal level.

74.     Although Dr. Allam noted that Plaintiff could sit for five hours per day, stand for two hours per day, and walk for one hour per day, he also noted that she was able to work part-time rather than full-time.  (AR 228-29.)

75.     On March 25, 2013, one of Hartford's medical case managers, Rowena Buckley, contacted Dr. Allam's office because the restrictions he previously noted did not seem to preclude full-time work. (AR 24-25.)

76.     Case notes from Hartford's database reveal the following entry regarding Dr. Allam's nurse Lisa's explanation regarding the restrictions and limitations noted on the February 20, 2013 APSCD:  "[Plaintiff] came to them with these R/Ls, they are not from Dr. Allam." (AR 25.)

77.     Dr. Allam affirmed the restrictions and limitations that were previously included in his APSCD in a fax he signed on March 27, 2013. (AR 419.)  Specifically, he reiterated left side only weight and reaching restrictions, repetitive fingering/handling restrictions, and the sitting, standing and walking restrictions noted on the form. (*Id.*)

78.     Based on these restrictions, Hartford had a vocational expert prepare an Employability Analysis Report dated April 10, 2013. (AR 404-11.)

79.     As noted in the Employability Analysis Report, the vocational expert determined that there were several types of jobs Plaintiff could perform on a

full-time basis including referral and information aide, surveillance system monitor, and food and beverage order clerk. (AR 409.)

### F.  Termination of Plaintiff's LTD Benefits

80.     Hartford sent Plaintiff a denial letter, dated April 30, 2013, informing her that her LTD benefits had been discontinued as of that date (the "Denial Letter"). (AR 340-43.) The letter listed the documents reviewed by Hartford in making its decision to terminate benefits. (AR 341-42.)

81.     The Denial Letter indicated that Hartford's decision to terminate LTD benefits was based on the finding that Plaintiff was no longer unable to engage in any occupation. (AR 342.) Specifically, the Denial Letter noted that on April 10, 2013, the Vocation Rehabilitation Clinical Case Manager performed an Employability Analysis that took into account the restrictions and limitations found in Dr. Allam's February 20, 2013 APSCD. (AR 342.) The Denial Letter reported three occupations Plaintiff would be qualified to perform that were not precluded by the restrictions and limitations noted by Dr. Allam. (*Id.*)

82.     Hartford notified Plaintiff of her right to appeal and specifically stated that, along with her appeal letter, Plaintiff could submit "written comments, documents, records and other information related to [her] claim." (AR 343.)

### G.  Plaintiff's Appeal

83.    Plaintiff appealed Hartford's decision in a letter dated June 15, 2013. (AR 332-39.)

84.    In her appeal letter, Plaintiff stated that she could work only part-time. (AR 339.)

85.    Plaintiff also stated that she had worked part time, three days a week, five hours a day, at Comtek Internet Solution Company from December 2012 to April 2013, and performed satisfactorily. (AR 335, 373.)

86.    As part of her appeal, Plaintiff submitted a letter from Dr. Allam, dated May 10, 2013, and addressed "To whom it may concern." (AR 349-50.

87.    Dr. Allam noted that:  "Patient takes multiple medications to help control her pain but the side effects of those medications cause drowsiness, sleepiness, and the inability to drive. These medications include Gabapentin 300 mg, Voltaran 1% gel, and Xanax 0.25 mg for anxiety." (AR 349.)

88.    Dr. Allam stated as follows with regard to Plaintiff's functional capacity:

As far as the patient's ability to work, she can not [sic]

work full time. *As stated by Dr. Donald Kim,*[3] she has significant loss of function in the left upper extremity for pushing, pulling and lifting, squeezing, grasping and overhead activities. She is able to work up to 8 hours in a single day – five hours sitting, two hours standing and one hour walking but not on a daily basis . . . . Ideally, patient should be able to work five hours per day, if she is able to find a job position that will support these hours. If not, she could work up to eight hours with the above restrictions – 5 hours sitting, 2 hours standing and 1 hour walking. Based on her disability, she can only work part time. *The QME Board found this patient disabled* having reached maximum medical improvement status. Due to her age and history of breast treatments, she will not improve beyond her current status.

(*Id.* (emphasis added).)

89.    Moreover, on May 14, 2013, Dr. Allam re-submitted the February 20, 2013 APSCD to Hartford, this time with a notation

---

[3] In making this statement, Dr. Allam appears to have relied on orthopedist Dr. Kim's April 2011 evaluation of Plaintiff. (AR 349.)

15

that although Plaintiff could sit, stand, and walk for a total of eight hours a day, she could do so "not every day – only 2-3 days per week." (AR 226-27.)

90.    After receipt of Plaintiff's appeal letter, on August 2, 2013, Hartford referred Plaintiff's case to an outside medical consultant, for an independent peer review. (AR 211-12.)

91.    Dr. Robert J. Cooper, a physician board certified in internal medicine/endocrinology, diabetes, and metabolism, conducted a paper review of the case. (AR 204-07.)

92.    Dr. Cooper noted that Plaintiff complained of left shoulder, hip, and wrist pain. (AR 205.)

93.    Dr. Cooper found "no evidence of ongoing impairment or restrictions and limitations from these conditions as of 05/01/2013." (*Id.*)

94.    Dr. Cooper also found no restrictions or limitations as a result of the medications prescribed to Plaintiff. (AR 206.)

95.    Dr. Cooper spoke with Dr. Allam on August 9, 2013. (AR 205.)

96.    As reported by Dr. Cooper, Dr. Allam told him that Plaintiff had been discharged from his practice. (*Id.*)

97.    According to Dr. Cooper, "Dr. Allam stated that there

were no other objective findings on exam or recent imaging studies to support restrictions or limitations as of 05/01/2013." (*Id.*)

98.   Dr. Cooper provided the following rationale for his findings:

The claimant is a 58 year old female who claims functional impairment due to cervicalgia, left shoulder impingement syndrome, lateral epicondylitis, cubital fossa lipoma, left wrist CTS, evidence of RSD and complex regional pain syndrome. However, based on review of the medical information, there is no evidence of ongoing impairment or restrictions and limitations from these conditions as of 05/01/2013. Based on review of the records, Dr. Allam on 01/03/2013 noted a normal musculoskeletal exam with normal range of motion of the extremities. Although there was mild pain with motion of the cervical spine and pain in the left elbow, these findings do not support ongoing impairment or restrictions and limitations . . . . Although Dr. Allam states in the attending physician letter on 05/10/2013 that medications are causing drowsiness, sleepiness and inability to drive, there is no evidence in the

medical records to support these restrictions or limitations. (AR 206.)

99.    On September 9, 2013, Hartford sent Plaintiff a letter upholding its denial based on the medical documents in the claim file, Plaintiff's additional submissions, the peer review by Dr. Cooper, and the Employability Analysis Report (the "Appeal Letter"). (AR 119-121.)

100.   The letter stated that the medical information does not support a finding that Plaintiff was totally disabled. Specifically, Hartford concluded:

> Therefore, based on the totality of the information presented, that included our independent review of the medical records received to date, your self-reported symptoms, the report from Dr. Cooper, whose opinion and expertise we further relied on, review by the Rehabilitation Case Manager and the policy provisions, Appeals concludes that the medical documentation in your file does not support a functional impairment that would have precluded you from performing the duties of any occupation beyond 4/30/13.

(AR 121.)

101.   The letter stated that because Hartford's April 30, 2013 decision terminating benefits was accurate, no additional benefits were payable. (AR 121.)

102.   Hartford's decision on appeal was "final and binding." (*Id.*)

### III.   STANDARD OF REVIEW

A participant or beneficiary of an ERISA plan may bring a civil action against a plan administrator "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, and to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Building upon an analogy to review of the discretionary acts of a trustee of a common-law trust, the Supreme Court has held that the scope of judicial review of an ERISA benefits decision depends on whether the plan confers discretion to the plan administrator in determining benefits. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). The Court reviews a denial of benefits *de novo*, unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Discretionary authority is unambiguously granted if a plan administrator has both the responsibility to interpret the terms of a plan and determine eligibility for

19

benefits. *See, e.g., Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006). In such a case, the Court applies a deferential standard and reviews the administrator's determinations for an abuse of discretion. *Id.* "Under this deferential standard, a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (internal quotation marks and citation omitted). Thus, deference to the administrator's benefits decision is required unless it is found to be "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (internal quotation marks and citation omitted).

This abuse of discretion standard of review applies even in the face of a conflict of interest often found in cases involving ERISA claims for benefits. Specifically, a conflict of interest arises in the common arrangement where an insurance company both determines a participant's eligibility for benefits and provides the funding for the payment of such benefits. *Glenn*, 554 U.S. at 112-15. When an administrator's benefits determination occurs under this type of conflict of interest, it must "be weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 554 U.S. at 115 (internal quotation marks and citation omitted).

The Supreme Court explained this standard:

We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. This kind of review is no stranger to the judicial system. Not only trust law, but also administrative law, can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.

*Id*. at 117.

Accordingly, the district court must take the conflict of interest into account when determining whether the plan administrator abused its discretion and must "temper the abuse of discretion standard with skepticism commensurate with the conflict." *Nolan v. Heald Coll.*, 551 F.3d 1148, 1153 (9th Cir. 2009) (internal quotation marks and citation omitted).

The Court applies this standard of review in reaching its conclusions of law.

## IV.   CONCLUSIONS OF LAW

1.     Plaintiff has standing as a plan beneficiary to bring this action against the plan administrator, Hartford, to recover benefits under the Plan. 29 U.S.C. § 1132(a)(1)(B).

21

2.      Plaintiff challenges Hartford's termination of her LTD benefits based on the administrative record; she offers no extrinsic evidence of malice, self-dealing, or bias in connection with Hartford's determination of her continued eligibility for benefits or in connection with Hartford's claims-paying history or claims-processing procedures.

3.      An administrator's decision to terminate benefits under an ERISA plan is subject to the same review as is an initial decision to deny benefits; thus, Hartford's decision to terminate Plaintiff's LTD benefits is subject to the review for abuse of discretion discussed in *Glenn*. *Muniz v. Amec Const. Mgmt.*, Inc., 623 F.3d 1290, 1296 (9th Cir. 2010) ("That benefits had previously been awarded and paid may be evidence relevant to the issue of whether the claimant was disabled and entitled to benefits at a later date, but that fact should not itself shift the burden of proof.")

4.      Because Hartford had the dual roles of claims administrator and insurer, it operated under a conflict of interest.  The Court must therefore consider this conflict of interest as a factor in the Court's determination of whether Hartford's decision to terminate Plaintiff's LTD benefits was an abuse of discretion.

5.      The Denial Letter adequately explained the reasons why Plaintiff's LTD benefits were terminated. Specifically, the Denial Letter explained the LTD benefits eligibility requirements, including the "any occupation"

standard. Moreover, in addition to listing the documents upon which Hartford relied, the Denial Letter outlined the results of the April 10, 2013 Employability Analysis. The Employability Analysis identified three occupations Plaintiff could perform notwithstanding the restrictions and limitations outlined in Dr. Allam's February 20, 2013 APSCD.

6.      As noted in the Denial Letter, the administrator relied on the most current medical reports from Plaintiff's treating physician in making its determination that Plaintiff was no longer eligible for LTD benefits. Specifically, Hartford relied on reports and notes from the only doctor who treated Plaintiff in the year before her LTD benefits were terminated. As the Denial Letter notes, Hartford relied upon Dr. Allam's February 20, 2013 APSCD, his offices notes from January 3, 2013, its own Medical Case Management Review on April 4, 2013, and the April 10, 2013 Employability Analysis.

7.      Despite Plaintiff's argument to the contrary, the Denial Letter was not procedurally defective for failing to advise Plaintiff what evidence she needed to submit on appeal. By identifying the most recent medical information as that relied upon in determining Plaintiff was no longer eligible for LTD benefits, Hartford also identified what medical information needed to be addressed in order for her to mount a successful appeal. Indeed, Plaintiff was not deprived of the opportunity to address the medical evidence

Hartford considered to be most relevant:  She sought and received an updated APSCD from Dr. Allam that clarified his opinion regarding her lack of ability to work a five-day work week. She also sought and received from Dr. Allam a letter dated May 10, 2013, in which Dr. Allam stated "[i]n [his] professional opinion, [Plaintiff] is disabled and should continue to receive disability status and benefits." (AR 349-50.)

8.      Although Plaintiff argues otherwise, Hartford did not selectively review the medical evidence in Plaintiff's claim file in order to support its denial on appeal. To the contrary, upon receiving the updated information from Dr. Allam regarding Plaintiff's restrictions and limitations, Hartford requested independent medical review.

9.      Specifically, Hartford sought Dr. Cooper's independent analysis of the clarified opinions of Plaintiff's treating physician, Dr. Allam. As noted herein, Dr. Allam's assessment of Plaintiff's restrictions and limitations in February 2013 differed from his May 2013 assessment, although the two assessments were not entirely inconsistent. More specifically, in May 2013, Dr. Allam stated clearly that Plaintiff could not work five eight-hour days per week, and that two or three such work days or, alternatively, five five-hour days per week, would be tolerable given her restrictions and limitations. These clarified restrictions and limitations are seemingly inconsistent with the part of his February 20, 2013 APSCD that reported

24

Plaintiff had the ability to walk, stand, and sit for approximately eight hours a day. On the other hand, the clarified restrictions and limitations were consistent with the notation on that same APSCD that "P[atien]t is able to work part time." (AR 229.)

10.     Dr. Cooper impliedly rejected Dr. Allam's clarified opinion regarding Plaintiff's restrictions and limitations, and Hartford permissibly relied upon Dr. Cooper's professional opinion. As noted in Dr. Cooper's report, Dr. Cooper discussed Dr. Allam's clarified opinion regarding Plaintiff's restrictions and limitations with him on August 9, 2013, and learned that no recent objective medical examination or testing supported those restrictions and limitations. Thus, Plaintiff's restrictions and limitations were based on her then-current self-reporting of her subjective symptoms. Indeed, looking to Dr. Allam's May 10, 2013 letter, it is evident that he relied not on current medical information but instead on the opinions of Plaintiff's past orthopedic evaluations. Specifically, Dr. Allam refers to orthopedic evaluations in April 2011 and July 2012, which reflect medical information from eight months to two years prior to his letter.

11.     Plaintiff's reliance on *Saffon v. Wells Fargo & Co.*, 522 F.3d 863 (9th Cir. 2008), is unconvincing. In *Saffon*, MetLife represented that it terminated disability benefits because the case file lacked a Functional Capacity Evaluation ("FCE"). *Id.* at 871. However, MetLife first referenced the

25

absence of an FCE its denial of the Plaintiff's appeal. *Id.* On these facts, the Ninth Circuit held that the claimant was not offered a full and fair review of her claim because if the lack of an FCE led to the termination of benefits, then MetLife should have sought one prior to its final decision on appeal, at a time when the plaintiff had the opportunity to present evidence required by MetLife. *Id.* at 871-72. As noted above, Plaintiff was given an opportunity to present relevant evidence on appeal, and she availed herself of that opportunity. Unlike the plaintiff in *Saffon*, Plaintiff here was advised that the report of her treating physician was relied upon in terminating her LTD benefits, her physician was given the opportunity to clarify his report, and that clarification was reviewed by a medical doctor who ultimately advised Hartford of his medical opinion that Plaintiff was no longer disabled within the meaning of the terms of the Plan.

12.     Neither can Hartford be criticized in the manner that the Ninth Circuit criticized MetLife for stating a different rationale for upholding its decision to terminate the plaintiff's benefits. *Id.* at 872 (noting that "the fact that the claims administrator presented a new reason at the last minute bears on whether denial of the claim was the result of an impartial evaluation or was colored by MetLife's conflict of interest"). Here, the Denial Letter advised Plaintiff that Hartford was terminating her LTD benefits in light of the vocational assessment that identified three positions she would be able to

perform notwithstanding the restrictions and limitations noted by her treating physician's latest APSCD. Plaintiff was advised of her right to appeal, and when Plaintiff availed herself of the opportunity to present a clarified medical opinion from her treating physician, Hartford sought a focused review of that clarified medical opinion.

13.     Hartford explained its decision upholding the termination of Plaintiff's LTD benefits. Hartford did not present a new reason for the termination of Plaintiff's LTD benefits; rather, it merely reiterated its earlier position and provided additional support for that position in light of Plaintiff's treating doctor's clarified opinion. Thus, Hartford did not engage in the type of *post hoc* rationalization that led the Ninth Circuit to find an abuse of discretion by the administrator in *Saffon*.

14.     Moreover, although the terms of the Plan would permit Hartford to conduct an in-person physical examination of Plaintiff, Hartford was not required to do so before terminating her LTD benefits. Such failure can amount to an abuse of discretion in some instances, but the failure to require a medical examination does not amount to an abuse of discretion under the facts of this case. *Cf. Montour*, 588 F.3d at 634 (finding an abuse of discretion where it was unclear that reviewing doctors were presented with all relevant medical information and where no physical examination was conducted).

15.     Thus, the decision to conduct a pure paper review does not establish that Hartford's decision to terminate benefits was an abuse of discretion. Here, Hartford relied on the assessment provided by Plaintiff's treating physician in making the decision to terminate benefits. When Dr. Allam clarified his opinion, Hartford took reasoned action in having the clarified opinion reviewed by Dr. Cooper. Dr. Cooper examined the medical evidence provided to him, discussed Plaintiff's case with Dr. Allam, and set forth his opinion regarding whether Plaintiff was disabled under the terms of the Plan.

16.     As is evident from his May 2013 letter, Dr. Allam relied on older medical evidence which does not support a finding of total disability as of the date that Plaintiff's LTD benefits were terminated.

17.     Plan administrators "are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker v. Nord*, 538 U.S. 822, 825 (2003). Thus, Hartford did not abuse its discretion in rejecting the clarified opinions provided by Dr. Allam in May 2013. Although Dr. Allam's clarification is not necessarily irreconcilable with his earlier opinion, it is somewhat inconsistent with that earlier opinion and is in large part based on outdated medical reports that do not specifically address Plaintiff's medical condition as of May 2013.

18.     Plaintiff's argument that Hartford abused its discretion by terminating Plaintiff's LTD benefits in the absence of evidence of improvement of her

disabling condition is unfounded. There was, in fact, evidence of improvement between the time Hartford approved benefits in 2010 and when it terminated benefits in 2013. For example, in 2010, Dr. Mashoof indicated that Plaintiff was unable to sit, stand or walk for any amount of time. However, in 2011, the same doctor indicated that Plaintiff could sit four hours a day and stand and walk thirty minutes a day. Thus, at that time, Dr. Mashoof stated that Plaintiff could work a five-hour work day. Indeed, Plaintiff worked part-time in 2013.

19.     Nor was it an abuse of discretion for Hartford to require objective evidence of Plaintiff's disability. The terms of the Plan contemplate the consideration of medical information, including objective medical information such as x-ray films. (AR 904.)  It is not unreasonable for a plan administrator to require some objective evidence as proof of total disability. *See, e.g., Jordan v. Northrop Grumman Corp. Welfare Ben. Plan*, 63 F. Supp. 2d 1145, 1156 (C.D. Cal. 1999), *aff'd, Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004) (overruled on other grounds by *Abatie*, 458 F.3d at 965); *Martin v. Cont'l Cas. Co.*, 96 F. Supp. 2d 983, 993 (N.D. Cal. 2000); *Voight v. Metropolitan Life. Ins. Co.*, 28 F. Supp. 2d 569, 578 (C.D. Cal. 1998).

20.     Dr. Allam originally opined that Plaintiff could work a total of eight hours a day, subject to a specific combination of sitting, standing, and

walking, but also that she could work on a part-time basis. When pressed, he

clarified his opinion that although she could work up to eight hours a day,

she could not do so for five days a week. However, he based this

clarification on outdated orthopedic reports. Additionally, the only then-

current medical information that supported a finding of disability was

Plaintiff's subjective complaints of pain. Dr. Cooper's review points out

these weaknesses in Dr. Allam's clarification.

21.    On this record, and taking into account the conflict of interest,

Hartford did not abuse its discretion in terminating Plaintiff's LTD benefits.

## V.    CONCLUSION

Upon review of the Administrative Record, the terms of the Plan, the

Findings of Fact and Conclusions of Law set forth herein, and under the relevant

legal standard, taking into account the administrator's conflict of interest, the Court

finds no abuse of discretion in the decision to terminate Plaintiff's LTD benefits.

Therefore, the Court hereby AFFIRMS Hartford's decision terminating Plaintiff's

LTD benefits.

**IT IS SO ORDERED.**

Dated:  June 12, 2015

Honorable Josephine L. Staton
United States District Judge